CHARLOTTE RUSSELL ET AL. *v.* HOWARD RUSSELL, SR.

LEIGH R. SCHULTZ, EXECUTRIX (ESTATE OF G. ALTON RUSSELL), ET AL. *v.* RUSSELL LINEN SERVICE, INC., ET AL.
(AC 25497)

Lavery, C. J., and DiPentima and Peters, Js.

Argued April 26—officially released September 27, 2005

*John-Henry M. Steele,* for the appellants-appellees (defendants).

*Richard L. Albrecht*, with whom were *Barbara M. Schellenberg* and, on the brief, *Courtney A. George*, for the appellees-appellants (plaintiffs).

*Opinion*

LAVERY, C. J. The defendants, in each of two cases consolidated for trial, appeal from the judgments rendered therein, and the plaintiffs in the second case cross appeal from the judgment rendered in that case. Howard Russell, Sr. (Howard Sr.), the sole defendant in the first action (accounting action), appeals from the judgment rendered by the trial court on an accounting conducted pursuant to General Statutes § 52-401 et seq., whereby it was determined that he owed the plaintiffs, Charlotte Russell and Leigh R. Schultz, executrix of the estate of G. Alton Russell, $15,764.40.[1] He claims on appeal that the court improperly applied General Statutes § 52-402 (d) to the facts of the case so as to hold him liable for payment of the entirety of the auditor's fees incurred from the accounting.

The defendants in the second action (contract action), Russell Linen Service, Inc. (Russell Linen), Howard Sr., Howard Russell, Jr. (Howard Jr.), and Helen Russell, appeal from the judgment of the trial court finding them liable to the plaintiffs[2] for $885,000 in damages for, inter alia, breach of a buy-sell agreement. The defendants argue on appeal that the court improperly (1) held the individual defendants liable for breach of the buy-sell agreement, (2) held the individual defendants liable under an implied contract theory, (3) rendered judgment on a detrimental reliance theory, (4) rendered judgment on an unjust enrichment theory, (5) concluded that a binding buy-sell agreement

---

[1] More precisely, the funds were alleged, and thus found, to be owed to the G. Alton Russell Revocable Trust, for which Schultz and Charlotte Russell are the trustees and Charlotte Russell is the beneficiary.

[2] The plaintiffs in each action are the same.

existed and (6) relied on the valuation performed by the plaintiffs' expert in determining the amount of damages due. In their cross appeal, the plaintiffs claim that the court improperly concluded that the defendants had not violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

As to the accounting action, we disagree with the defendant's claim and, accordingly, affirm the judgment of the trial court. Regarding the contract action, we agree with the defendants' fourth and sixth claims, disagree with their remaining claims and the claim raised by the plaintiffs in the cross appeal and, accordingly, affirm in part and reverse in part the judgment of the trial court.

The following facts, found by the court or admitted by the pleadings, and procedural history are relevant to the appeals and cross appeal. The parties are five family members and a family owned and operated corporation, and the actions arise from events that occurred following the death of another family member, G. Alton Russell (decedent), on April 4, 2000. Howard Sr. is the decedent's brother. Howard Jr. is the son of Howard Sr., and Helen Russell is the wife of Howard Jr. Charlotte Russell is the decedent's widow and the beneficiary of a trust containing his assets. Schultz is the decedent's daughter and the executrix of his estate.

Russell Linen is a closely held Connecticut corporation through which various family members run a linen supply business originally started by the parents of the decedent and Howard Sr. At the time of his death, the decedent was an officer and director of Russell Linen and owned 45 percent of its stock; Howard Sr. owned the remaining 55 percent. Howard Sr. and Howard Jr. are officers and directors of Russell Linen, and Helen Russell is a director.

The decedent and Howard Sr. also were equal partners in a partnership called Russell Associates. Russell Associates managed various rental properties, which the decedent and Howard Sr. owned as tenants in common.

In or around 1994, the decedent and Howard Sr. applied and were approved for life insurance policies, each in the amount of $500,000. The policies were purchased through insurance agent Ted Vartelas. On financial supplements signed by each brother and submitted with their applications, in a section requesting information regarding the purpose of the insurance, boxes labeled "Estate Preservation" and "Buy/Sell" were checked off. Also on each financial supplement under the heading "Buy/Sell," the current market value of the business is identified as "$1,000,000." Russell Linen was the named beneficiary for each policy and made all but the initial premium payments.[3]

At about the time the life insurance policies were purchased, the decedent told Charlotte Russell that he and Howard Sr. had entered into a buy-sell agreement and that she would not have to "go after" Russell Linen. Also around that time, the decedent told his son, Dean Russell, that he had spoken with Vartelas and that the decedent and Howard Sr. had reached an agreement regarding life insurance to finance a buyout of each other's stock. The decedent further told his son that any balance owed regarding the decedent's interest in Russell Linen would be taken care of by the business.

In 1998, Edward Paulson, another insurance agent acquainted with the family, approached the decedent

---

[3] As noted by the court, the initial payments were "paid by each insured individually . . . from funds advanced by Russell Linen. This was done according to Vartelas, the agent, to avoid taxable income to each insured." The brothers' estates initially were designated as beneficiaries of the policies, but amendments thereafter were effected to substitute Russell Linen for the estates.

and proposed selling him life insurance as part of a financial planning program that would include a buy-sell agreement. The decedent declined, explaining to Paulson that he already had insurance covering such an agreement.

Following her father's death, Schultz found some documentation evidencing his life insurance policy. She spoke with Howard Sr., who initially denied the existence of a policy. He later admitted there was a policy but took the position that the proceeds belonged to him, were to provide financing for Russell Linen or both.[4]

On April 1, 2002, the plaintiffs filed the accounting action, which raised issues relating to Howard Sr.'s dealings with Russell Associates. Generally, the plaintiffs alleged that Howard Sr. had used partnership moneys for personal or nonpartnership purposes. The plaintiffs sought an accounting investigation and report as to several categories of transactions[5] and, if warranted, payment to the estate of any amounts due by virtue of the decedent's interest in the partnership.

On September 20, 2002, the plaintiffs filed the contract action, alleging, under a number of theories, that

---

[4] At trial, Dean Russell testified that the insurance proceeds were deposited into a Russell Linen account accessible by Howard Sr. and Howard Jr. and that, about a year and one half after the decedent's death, Howard Sr. admitted there was a policy. Howard Sr. testified similarly. He confirmed that he applied for the insurance proceeds two days after his brother had died, that they were received two weeks later and that, for reasons not clearly explained, he deposited them into a "special bank account" outside the working business. According to Howard Sr., all of the proceeds were applied to expenses and debts of Russell Linen, and, by December 20, 2001, the account was closed.

[5] Specifically, the plaintiffs questioned the propriety of the following actions: Howard Sr.'s taking a portion of the proceeds from a sale of partnership property in purported repayment of a loan; payment by Russell Associates of certain insurance premiums for policies owned by other entities or individuals; loans between Russell Associates and Russell Linen, and repayment thereof; and payment by Russell Associates of legal fees incurred by Howard Sr. for his personal business.

the defendants wrongfully had appropriated funds owing to the decedent's estate. The first count of the complaint outlined who the parties were in relation to each other and to Russell Linen and alleged breach of contract. Specifically, it was claimed that the decedent and Howard Sr., "as individuals, officers and directors of Russell Linen, entered into an agreement that Russell Linen would purchase life insurance on the life of [the decedent], payable in a lump sum to Russell Linen upon his death, which sum would be paid by Russell Linen to the Estate of [the decedent], in part payment for the stock owned by [the decedent] in Russell Linen. [Howard Sr. and the decedent] further agreed that in the event the stock had a fair market value greater than the insurance proceeds, then the corporation would be permitted to pay the balance of the value over a period of time in annual payments." It was further alleged that pursuant to the agreement, life insurance policies were purchased and that "[u]pon the death of [the decedent], Russell Linen was paid in excess of $500,000 in life insurance proceeds[6] pursuant to said policies, but, despite demand, it has failed to purchase the shares of stock of Russell Linen owned by the [decedent] in breach of the agreement."

Counts two through four of the contract action incorporated the factual allegations from the first count and averred that there were implied agreements between the decedent, Howard Sr. and Russell Linen that had been breached; that the decedent had relied on the representations of Howard Sr. and Russell Linen to his detriment; and that the defendants, by their failure to purchase the decedent's stock and their retention of the life insurance proceeds, were unjustly enriched at the plaintiffs' expense. The fifth count incorporated the allegations of counts one through four and alleged that

---

[6] There apparently existed two other smaller policies on the decedent's life. The circumstances of their issuance are not clear from the record.

the defendants, as stockholders, directors and officers, respectively, had breached their fiduciary duties owed to the plaintiffs.[7] The sixth count incorporated the allegations of counts one through five and alleged that the defendants through their actions had violated CUTPA.

The two cases were consolidated for a trial that was held in July, 2003. On September 19, 2003, on the basis of the defendants' failure to agree to a stipulation or to provide the information sought via the accounting action, the court ordered that an accounting be conducted. On October 21, 2003, an accountant was appointed, and, on January 7, 2004, the accountant submitted a report to the court, in which it had been determined that the plaintiffs were owed a total of $5302.60. Thereafter, the plaintiffs filed a motion for judgment on the report, requesting the amount determined to be due by the accountant, along with $10,025 for the accountant's fees and expenses and $436.80 in costs. On May 12, 2004, the court granted the plaintiffs' motion and rendered judgment in the accounting action awarding total damages of $15,764.40.

On May 13, 2004, the court issued a memorandum of decision addressing the claims of the contract action. Therein, the court found that the decedent and Howard Sr. had agreed orally to a buy-sell agreement and that the proceeds of the decedent's life insurance policy were intended to finance the contemplated stock purchase. Accordingly, the court concluded that the first four counts of the plaintiffs' complaint had been proven. Given its ruling on those counts, the court stated further

[7] Count five is the only portion of the complaint that alleges particular acts, or failures to act, on the part of Howard Jr. and Helen Russell. Specifically, it is claimed that they surrendered their fiduciary duties to Howard Sr. and, in essence, allowed him to retain the insurance proceeds instead of purchasing the decedent's stock and allowed him to oppress the plaintiffs, as minority shareholders, by freezing them out and denying them any benefits from their stock ownership.

that there was no need to address the allegations of the fifth count.[8] As to the sixth count, the court opined that the defendants' conduct did not fall within CUTPA because "[i]n essence, this was a dispute between two private parties arising out of a jointly owned business having no effect on the public at large and while perhaps the defendants' actions might have been unfair, they could not be considered to be unscrupulous or oppressive." In determining the amount of damages, the court credited the testimony of the plaintiffs' expert, who valued the decedent's interest in Russell Linen at the time of his death at $885,000. The judgment "require[s] that the plaintiffs transfer the decedent's shares of stock in Russell Linen Service Company, Inc., to the defendants, in exchange for the payment by the defendants of $885,000.00 to the plaintiffs."

These appeals and the cross appeal followed. Additional facts and procedural history will be provided as necessary.

I

The sole issue raised in Howard Sr.'s appeal from the judgment in the accounting action is his claim that the court improperly applied § 52-402 (d) to the facts of this case. Particularly, he argues that pursuant to the

---

[8] The court apparently did not render any judgment as to the fifth count. Although a judgment that disposes of only part of a complaint normally is not an appealable final judgment; *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 262 Conn. 240, 246, 811 A.2d 1272 (2002); we conclude that we have jurisdiction over this appeal because the court's overt refusal to address the fifth count was the functional equivalent of a denial of the claims raised therein. See *Ahneman* v. *Ahneman*, 243 Conn. 471, 480, 706 A.2d 960 (1998). The circumstances presented are not simply a matter of a court's inordinate delay in ruling on a matter. See, e.g., *Tough* v. *Ives*, 159 Conn. 605, 606, 268 A.2d 371 (1970). Rather, like the trial court in *Ahneman*, the court here explicitly and on the record in its memorandum of decision rendered an a priori decision that it would not consider count five. See *Ahneman* v. *Ahneman*, supra, 480 n.14.

terms of the statute, he should not have been held liable for all of the fees of the accountant. We disagree.

"The interpretation of a statute, as well as its applicability to a given set of facts and circumstances, involves a question of law and our review, therefore, is plenary." (Internal quotation marks omitted.) *Allison* v. *Manetta,* 84 Conn. App. 535, 539, 854 A.2d 84, cert. denied, 271 Conn. 931, 859 A.2d 582 (2004). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan,* 268 Conn. 222, 230–31, 842 A.2d 1089 (2004). When the meaning of statutory text is plain and unambiguous and does not lead to unworkable results, however, a court in construing it should not consider extratextual evidence. See id., 231 n.8; General Statutes § 1-2z.

General Statutes § 52-402 (d) provides in relevant part that following the reporting of a court-ordered accounting, "[t]he fees and expenses of the auditors, as fixed and allowed by the court, shall be paid by the party in whose favor the report is made and the court shall render judgment that *the party in whose favor it was made shall recover the sum found to be due, with costs, including the fees and expenses of the auditors.*" (Emphasis added.) Pursuant to this provision, the court ordered that the defendant reimburse the plaintiffs for the fees incurred in the accounting.

Howard Sr. argues that he should not have to pay all of the accountant's fees[9] because the report produced in the accounting action was not in "favor" of the plaintiffs as contemplated by the statute. According to Howard Sr., because the accounting issues raised by the plaintiffs concerned amounts in excess of $50,000, but the ultimate amount determined to be due to them was only $5302.60, the accounting report "actually favored or substantiated *the defendant's* position in the litigation." (Emphasis added.) Accordingly, he claims that the plaintiffs were not prevailing parties entitled to reimbursement for the accountant's fees. We reject this argument.[10]

The provision at issue does not clearly and unambiguously address the situation of partial vindication as to the claims raised in an accounting action, particularly, in whose "favor" a report is considered to be made in such circumstances. We therefore find guidance in cases construing the synonymous language of "prevailing party"; see *Wallerstein* v. *Stew Leonard's Dairy*, 258 Conn. 299, 303, 780 A.2d 916 (2001) ("plaintiff was the prevailing party of record because a judgment had been ordered in his favor"); and the law governing costs of litigation generally.

Our Supreme Court and this court, in construing various statutory fee shifting provisions, repeatedly have cited favorably the following definition of a prevailing party: "[A] party in whose favor a judgment is rendered, *regardless of the amount of damages awarded . . . .*" (Emphasis added; internal quotation marks omitted.) *Frillici* v. *Westport*, 264 Conn. 266, 285, 823 A.2d 1172

[9] The defendant does not specify what portion of the fees he seeks to be relieved from paying.

[10] Although the defendant also claims that he did not dispute certain portions of the plaintiffs' accounting claims, he does not direct us to any evidence in this regard or explain his failure to agree in part to the stipulation sought by the plaintiffs before an accounting was ordered.

(2003); *Wallerstein* v. *Stew Leonard's Dairy*, supra, 258 Conn. 303; *Right* v. *Breen*, 88 Conn. App. 583, 591, 870 A.2d 1131, cert. granted on other grounds, 274 Conn. 905, 876 A.2d 14 (2005); see also *Wallerstein* v. *Stew Leonard's Dairy*, supra, 304 ("prevailing party is a legal term of art . . . [referring to] one who has been awarded *some* relief by the court" [emphasis added; internal quotation marks omitted]). "Generally, costs may be awarded to a successful party-plaintiff as the prevailing party where there is success on the merits of the case although not to the extent of the plaintiff's original contention, or where the plaintiff is not awarded the entire claim. A party need not prevail on all issues to justify a full award of costs, and it has been held that if the prevailing party obtains judgment on even a fraction of the claims advanced, or is awarded only nominal damages, the party may nevertheless be regarded as the 'prevailing party' and thus entitled to an award of costs." 20 Am. Jur. 2d, Costs § 14 (1995).

On the basis of the foregoing, we conclude that a party is considered to have prevailed, i.e., a matter has been decided in that party's favor, when the party obtains a judgment awarding at least some, but not necessarily all, of the relief sought. Applying that rationale to § 52-402 (d), we conclude that a party seeking an accounting has obtained a report in that party's favor when the report has established that at least some of the amounts alleged to be due are in fact owed to the party. Because that was the case here, the court properly determined that all of the accountant's fees were chargeable to Howard Sr.

II

We now turn to the issues arising from the contract action. The defendants claim first that the court improperly held the individual defendants, Howard Sr., Howard Jr. and Helen Russell, liable for breach of the buy-sell

agreement. According to the defendants, the evidence submitted at trial tends to support a conclusion that an agreement existed between the decedent and Russell Linen only and not the individual defendants. After a careful review of the pertinent parts of the record, we conclude that the defendants have mischaracterized the court's judgment, which we construe as having been rendered against Howard Sr. only.

Although we have reviewed all of the testimony and the evidence submitted at trial, we rely primarily on the pleadings and judgment in the contract action to assist us in resolving the defendants' claim. "The construction of the effect of pleadings is a question of law over which this court exercises plenary review." *Middlesex Mutual Assurance Co.* v. *Vaszil*, 89 Conn. App. 482, 495, 873 A.2d 1030 (2005); see also *Cavolick* v. *DeSimone*, 88 Conn. App. 638, 652, 870 A.2d 1147 (interpretation of pleadings is question of law determined by language of pleadings, basic nature of underlying factual situation), cert. denied, 274 Conn. 906, 876 A.2d 1198 (2005). Furthermore, the interpretation of a court's judgment also presents a legal question. *Phoenix Windows, Inc.* v. *Viking Construction, Inc.*, 88 Conn. App. 74, 77, 868 A.2d 102, cert. denied, 273 Conn. 932, 873 A.2d 1001 (2005).

In the memorandum of decision, the precise conclusion stated was that "[t]he court finds the allegations of the first, second, third and fourth counts of the plaintiffs' complaint to have been established by the evidence adduced at the trial." The judgment file, similarly, states that "the court issued a Memorandum of Decision finding in favor of the plaintiffs on the First, Second, Third and Fourth Counts of the Complaint . . . ." Given the language used, it is not entirely clear against which defendants the court found on counts one through four.

Looking to the complaint, the first count, alleging breach of an express buy-sell agreement, does not

include any allegations of wrongdoing by Howard Jr. and Helen Russell, but merely identifies the former as an officer-director and the latter as a director of Russell Linen. Moreover, neither Howard Jr. nor Helen Russell or Russell Linen are claimed to have been parties to the agreement that is alleged; rather, only Howard Sr. is claimed to have agreed with the decedent as to the pertinent terms previously described. Howard Jr. and Helen Russell were not alleged to be privy to either the agreement or its breach, nor is it averred that, in their respective roles within the corporation, they participated in any fashion in the actions or inactions comprising the breach. "It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Provenzano* v. *Provenzano*, 88 Conn. App. 217, 225, 870 A.2d 1085 (2005).

The court's memorandum of decision includes subsidiary findings that mirror the allegations against Howard Sr. Specifically, the court found that the decedent "told his wife Charlotte that he had entered into a buy-sell agreement with Howard [Sr.] and that she would not have to 'go after' Russell Linen," and that the decedent had told his son that "he and Howard [Sr.] had come to an agreement about a life insurance policy to buy each other's stock out." Moreover, the court noted, and thereafter agreed with, the plaintiffs' claim that the insurance proceeds were "intended to finance the buy-sell agreement that [the decedent] and Howard [Sr.] orally agreed to when the policies were purchased." The court's opinion is devoid of findings pertaining to any agreement, or breach thereof, by Howard Jr., Helen Russell or Russell Linen.[11]

---

[11] We thus reject as completely unfounded the defendants' assertion in their brief that "the facts as found by the trial court all appear to relate solely to the corporate defendant, Russell Linen . . . ."

"It is axiomatic that the parties are bound by their pleadings"; (internal quotation marks omitted) *Colliers, Dow & Condon, Inc.* v. *Schwartz*, 88 Conn. App. 445, 455, 871 A.2d 373 (2005); and it is equally "clear that [t]he court is not permitted to decide issues outside of those raised in the pleadings . . . . A judgment in the absence of written pleadings defining the issues would not merely be erroneous, it would be void." (Internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 414, 867 A.2d 841 (2005); see, e.g., *Bartomeli* v. *Bartomeli*, 65 Conn. App. 408, 412–13, 783 A.2d 1050 (2001) (court improperly held company liable for breach of contract when complaint alleged breach by individual only). On the basis of the foregoing, we conclude that the court here, in finding the allegations of the first count proven, properly adhered to these strictures and decided only the issue raised by those allegations—whether Howard Sr. was liable for breach of the buy-sell agreement.[12] Accordingly, the defendants' claim that the court ruled against Russell Linen, Howard Jr. and Helen Russell on count one is rejected.

### III

The defendants next claim that the court improperly held the individual defendants liable under an implied contract theory. We decline to address this claim, as it has been briefed inadequately.

"[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . .

"[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their

---

[12] To the extent the defendants argue that this conclusion was unsupported by the evidence, we address that claim in part VI.

briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.) *Lowe* v. *Shelton*, 83 Conn. App. 750, 762, 851 A.2d 1183, cert. denied, 271 Conn. 915, 859 A.2d 568 (2004).

The defendants have devoted just eight lines of their brief to this issue, citing only one case in support of an elementary proposition. See *Coelho* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 111, 544 A.2d 170 (1988) (noting that implied contracts arise when there is actual agreement between parties). They have not provided the required argument by applying the law governing implied contracts to the facts of this matter, but rather have made a mere assertion of error. No standard of review has been identified. See Practice Book § 67-4 (d). Due to the lack of analysis provided by the defendants in pursuit of their claim of error, we decline to afford it review.[13]

---

[13] Additionally, the defendants' inadequate briefing is exacerbated by the fact that the court in its memorandum of decision did not make explicit the findings underlying its conclusion as to the claim, and the defendants thereafter failed to request an articulation. "It is the responsibility of the appellant[s] to move for an articulation in order to clarify the basis of the trial court's decision should such clarification be necessary for effective appellate review of the issue on appeal. . . . It is, therefore, the responsibility of the appellant[s] to move for an articulation or clarification of the record when the trial court has failed to state the basis of a decision. . . . [W]here the trial court's decision is ambiguous, unclear or incomplete, an appellant must seek an articulation . . . or this court will not review the claim." (Internal quotation marks omitted.) *Dent* v. *Lovejoy*, 85 Conn. App. 455, 468–69, 857 A.2d 952 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

We note, however, that the defendants, in making their claim, premise it on a misconstruction of the court's judgment. Specifically, they characterize that judgment as having been rendered against all of the individual defendants. In the second count of their complaint alleging breach of an implied contract, however, the plaintiffs in describing the claimed agreement averred only that "there were implied agreements between [the decedent], Howard Russell, Sr. and Russell Linen that Russell Linen would purchase life insurance on the life of [the decedent], payable in a lump sum to Russell Linen upon his death, which sum would be paid by Russell Linen to the Estate of [the decedent], in part payment for the stock owned by [the decedent] in Russell Linen." Accordingly, when the court concluded that "the allegations of the . . . second . . . [count] of the plaintiff's complaint [had] been established by the evidence adduced at the trial," it was rendering judgment on that count against Russell Linen and Howard Sr. only.

## IV

The defendants also claim that the court improperly ruled in favor of the plaintiffs on the third count of their complaint, which the defendants characterize as a claim of estoppel or promissory estoppel and the plaintiffs as a claim of negligent misrepresentation. We decline to address this issue.

In the third count of the complaint, the plaintiffs incorporated the allegations of counts one and two and alleged further that "[t]he Defendants Howard [Sr.] and Russell Linen expected or should have reasonably expected that [the decedent] would rely on their representations as described above, and [the decedent] did rely on their representations and promises to his detriment and damage." Accordingly, when the court concluded that the allegations of the third count had been established, it rendered judgment on that count as to

Howard Sr. and Russell Linen only. Insofar as our resolution of the claims in parts II, III and VI of this opinion provides independent bases for the affirmance of the court's judgment against these two defendants, it is unnecessary for us to address the claims raised as to count three. See, e.g., *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 837 A.2d 736 (2003).

V

The defendants' next claim is that the court improperly found for the plaintiffs on the count of their complaint alleging unjust enrichment. We agree.

The fourth count of the plaintiffs' complaint incorporated the factual allegations of their breach of contract and misrepresentation claims and alleged further that "[t]he [Defendants'] failure to purchase the stock owned by [the decedent] and their retention of the life insurance proceeds [have] unjustly enriched the Defendants to the detriment of the Plaintiffs." The court found that the fourth count had "been established by the evidence adduced at the trial" and thereby rendered judgment as to that count against all of the defendants.

"Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract. . . . Recovery is proper if the defendant was benefited, the defendant did not pay for the benefit and the failure of payment operated to the detriment of the plaintiff." (Citation omitted.) *United Coastal Industries, Inc.* v. *Clearheart Construction Co.*, 71 Conn. App. 506, 512, 802 A.2d 901 (2002).

"[T]he determinations of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings . . . that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are

clearly erroneous or involve an abuse of discretion." (Internal quotation marks omitted.) Id., 510–11.

Regarding Howard Sr. and Russell Linen, we conclude that the court's judgment holding them liable on the basis of unjust enrichment was improper because unjust enrichment and breach of contract are mutually exclusive theories of recovery. See *Gagne* v. *Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001) ("lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment"), on appeal after remand, 80 Conn. App. 436, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004); 26 S. Williston, Contracts (4th Ed. 2003) § 68:5, p. 58 ("[w]here the plaintiff has no alternative right on an enforceable contract, the basis of the plaintiff's recovery is the unjust enrichment of the defendant"); 66 Am. Jur. 2d 605, 621, Restitution and Implied Contracts §§ 9 ("[u]njust enrichment . . . applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by action on the contract"), 24 (2001) ("action for unjust enrichment cannot lie in the face of an express contract"). Consequently, having already found against Howard Sr. and Russell Linen on breach of contract theories, the court's judgment against them on the unjust enrichment claim was improper.

As to Howard Jr. and Helen Russell, we conclude that there was no evidence submitted at trial to demonstrate that they benefited, either directly or indirectly, from the wrongful retention of the proceeds of the decedent's life insurance policy. As such, the court's determination that they were unjustly enriched is based on a clearly erroneous factual finding and cannot stand.

In particular, the only evidence pertaining to the disposition of the insurance proceeds was the testimony of

Howard Sr.[14] and a report generated by Russell Linen's accounting software that logged activities of the savings account into which the proceeds were deposited, covering the time period between the deposit of the insurance check in April, 2000, and the closing of the account in December, 2001. According to Howard Sr.'s testimony, none of the funds were given to his family members. Rather, he testified, they were applied to different expenses of Russell Linen. When Howard Sr. was questioned about various entries in the savings account activity report, he stated that they represented the payment of business expenses and the payoff of business debts.[15]

Although Howard Jr. and Helen Russell admitted that they were directors or officers of Russell Linen or both, it does not follow from those circumstances alone that they benefited personally from Russell Linen's use of the insurance proceeds to satisfy its business expenses.[16] Cf. *Zanoni* v. *Hudon*, 48 Conn. App. 32, 40, 708 A.2d 222, cert. denied, 244 Conn. 928, 711 A.2d 730 (1998) (conservator did not benefit personally from funds alleged to be wrongfully retained by his ward's

[14] Howard Jr. and Helen Russell did not testify at trial, nor is there any indication that they were deposed.

[15] The defendants introduced into evidence another accounting software report that detailed the activity in Russell Linen's checking account for the same time period, which tends to corroborate Howard Sr.'s testimony. The checking account report includes entries showing deposits that correspond to transfers from the savings account and identified in the savings account report as "Russell Linen: Business Expense." Although the checking account report reflects periodic payments to Howard Sr., Howard Jr. and Helen Russell for various purposes, those payments together total approximately $60,000, an amount much smaller than the amount of the insurance proceeds. There is no indication that the payments were for illegitimate purposes and, further, the checking account report reflects deposits other than those representing transfers from the savings account containing the insurance proceeds.

[16] There is no evidence that they were compensated by the company for their services as directors, officers or both, or even that they performed any such services.

estate). Moreover, because they did not own any of Russell Linen's stock, they did not benefit indirectly from the company's reduced liabilities, nor can we assume that, by virtue of their familial relationship to Howard Sr., the sole living shareholder aside from the plaintiffs, they necessarily gained. "In the absence of a benefit to the defendant[s], there can be no liability in restitution [on a theory of unjust enrichment] . . . ." (Internal quotation marks omitted.) *United Coastal Industries, Inc.* v. *Clearheart Construction Co., Inc.*, supra, 71 Conn. App. 512.

In sum, the court improperly concluded that Howard Sr. and Russell Linen were liable to the plaintiffs on a theory of unjust enrichment, because it already had concluded that they were liable on mutually exclusive theories of breach of contract. Furthermore, the court's finding that Howard Jr. and Helen Russell were benefited by Russell Linen's improper use of the insurance proceeds was unsupported by the evidence and, thus, clearly erroneous, such that its conclusion that they were unjustly enriched cannot stand.

VI

The defendants claim next that the evidence submitted and the facts found are insufficient to support the court's conclusion that a binding buy-sell agreement existed. In particular, the defendants argue that the requisite consideration for such an agreement was lacking because the evidence showed only that Russell Linen gratuitously and unilaterally purchased the decedent's life insurance policy while the decedent provided nothing in return. We disagree.

"The doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable." (Internal quotation marks omitted.) *New England Rock Services, Inc.* v. *Empire Paving, Inc.*,

53 Conn. App. 771, 776, 731 A.2d 784, cert. denied, 250 Conn. 921, 738 A.2d 658 (1999). "[C]onsideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by the promisee . . . ." (Internal quotation marks omitted.) *Martin Printing, Inc.* v. *Sone*, 89 Conn. App. 336, 345, 873 A.2d 232 (2005). "Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard." (Internal quotation marks omitted.) Id. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Narumanchi* v. *DeStefano*, 89 Conn. App. 807, 811–12, 875 A.2d 71 (2005).

In making their argument, the defendants again begin from a premise that mischaracterizes the court's judgment as to count one. As we concluded in part II on the basis of our interpretation of the complaint and the judgment rendered thereon, the express buy-sell agreement that the court found to have been established was between the decedent and Howard Sr., not between the decedent and Russell Linen. Viewed from this perspective, it is clear that the court's finding that there was consideration for the agreement is not clearly erroneous.

It is well established in our case law "that the exchange of promises is sufficient consideration to support a finding of the existence of a contract." *Christophersen* v. *Blount*, 216 Conn. 509, 511 n.3, 582 A.2d 460 (1990); see also *Coniglio* v. *White*, 72 Conn. App. 236, 243 n.5, 804 A.2d 990 (2002) ("[m]utual promises qualify as sufficient consideration for a binding contract"); 17A Am. Jur. 2d 147, Contracts § 128 (2004) ("[m]utual promises are generally held to be sufficient consideration

for each other; a promise by one party to an agreement is sufficient consideration for a promise by the other party").

Here, the evidence presented was adequate to support a finding that the decedent and Howard Sr. had exchanged promises to cause Russell Linen to repurchase the stock of whichever of the brothers predeceased the other and that the proceeds of that brother's life insurance policy would be applied toward that end. Three people testified that the decedent had told them that he and Howard Sr. had such an agreement. Although Howard Sr. testified otherwise, it was for the trier of fact to weigh the conflicting testimony, and we will not revisit its credibility determinations. See *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 53, 861 A.2d 473 (2004). Furthermore, the brothers' mutual promises can be inferred from their purchase of identical life insurance policies, proximate in time and each for an amount representing half of the value of the company at that juncture, which policies were obtained by their signed applications specifying the purposes of "Buy/Sell" and "Estate Preservation." "[I]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence." (Internal quotation marks omitted.) *In re Kristy A.*, 83 Conn. App. 298, 316, 848 A.2d 1276, cert. denied, 271 Conn. 921, 859 A.2d 579 (2004).

Because there was adequate evidence for the court to find that consideration existed for the buy-sell agreement, its conclusion that the brothers had entered one is legally proper.[17] Moreover, the court's determina-

---

[17] We note that even if the claim is construed as attacking the court's implicit finding that there was consideration sufficient to support an implied contract between the decedent and Russell Linen, such consideration also may be found in mutual promises whose existence is supported by the same evidence. Specifically, the brothers, as agents of the corporation, promised on its behalf to purchase the stock of whichever brother predeceased the other. In return, each brother promised to cause his estate to sell that stock to the corporation.

tion that Howard Sr. had breached that agreement also is supported by the evidence. Specifically, the decedent's children testified that his stock had not been repurchased by Russell Linen, and Howard Sr. himself confirmed that he had used the proceeds of his brother's life insurance policy to pay off loans and expenses of the company. His testimony was corroborated by the accounting records of Russell Linen. Based on the foregoing, the defendants' sixth claim of error fails.

## VII

The defendants' final claim in the contract action is that the court, in determining the amount of damages due to the plaintiffs, improperly relied on the valuation of Russell Linen by the plaintiffs' expert. In particular, the defendants argue that the expert, in determining the value of Russell Linen as of the date of the decedent's death, improperly included the decedent's life insurance proceeds as an asset of the company. We agree.

We review damages awards under a well settled standard. "[T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Frillici* v. *Westport*, supra, 264 Conn. 282. The issue of the fair market value of a corporation also presents a factual determination subject to the clearly erroneous standard. See *Stearns* v. *Stearns*, 4 Conn. App. 323, 328, 494 A.2d 595 (1985).

"It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed. . . . The injured party, however, is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain. . . . Guarding against excessive

compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach." (Internal quotation marks omitted.) *Parker* v. *Slosberg*, 73 Conn. App. 254, 265–66, 808 A.2d 351 (2002).

Here, Howard Sr. and the decedent agreed that Russell Linen would purchase the decedent's 45 percent interest in the company from his estate. In determining the value of that interest so as to give the estate the benefit of the brothers' bargain, the court relied on a valuation of the company as of the date of the decedent's death. That valuation was performed by Arthur Kuperman of Weiser & Co., LLP. Kuperman testified at trial and his report was admitted as an exhibit. In his report, Kuperman determined the equity of the company by subtracting its total liabilities from its total assets and calculated the decedent's interest by multiplying the equity figure by 45 percent.[18] Included in an appended itemization of the company's assets is $563,000 that represents the amount collected on the decedent's life insurance policies.[19]

Kuperman confirmed that his understanding of the purpose of the appraisal was that it was for tax purposes, as well as for a possible sale of stock. When asked whether he knew "anything else about the case, about the positions of the parties, or the negotiations or the claims, or the lawsuit, or anything of that nature," he replied that he did not and later reiterated that he "wasn't given any other information." Kuperman testified that he included the proceeds of the life insurance policies because they were "an asset of the company . . . payable to the company." He explained that as of the date of the decedent's death, "in essence, [the

[18] Although the sum thus arrived at is $885,375, the report ultimately rounded that figure to $885,000.

[19] See footnote 6.

company] would have a receivable for some amount on a cash surrender value of a policy."

After considering the foregoing, we conclude that the inclusion of the entirety of the decedent's life insurance proceeds, for purposes of determining damages due for breach of the buy-sell agreement, was illogical and, thus, improper. By including the proceeds from the $500,000 policy, which were not intended to be retained as a company asset but to provide outside financing for a buyout, the court artificially inflated the value of the company (and hence the decedent's interest therein). Because the plaintiff's expert was unaware of the actual purpose of his appraisal, he likely failed to appreciate that inclusion of the proceeds as an asset, although proper for tax or accounting purposes, did not make sense in the context of determining the value of the company to effectuate a buyout of the decedent's interest.

In making findings as to the value of a company, "[t]he trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as [it] finds applicable; [the court's] determination is reviewable only if [it] misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Internal quotation marks omitted.) *Stearns* v. *Stearns*, supra, 4 Conn. App. 328. We conclude that the court improperly overlooked the consideration that the decedent's $500,000 policy[20] was never intended to be an asset of the company for purposes of determining the worth of the decedent's interest, but rather was meant to finance the buyout of his shares.

[20] Because there is no indication that the smaller policies on the decedent's life were intended to effectuate the brothers' buy-sell agreement, we conclude that the proceeds of those policies properly were included in the expert's valuation as assets of Russell Linen.

Accordingly, the court's award of damages of $885,000 is clearly erroneous.

## VIII

We turn last to the issue raised by the plaintiffs in their cross appeal from the judgment in the contract action. The plaintiffs claim that the court improperly determined that the defendants' actions did not constitute a violation of CUTPA. We disagree.

We first note the applicable standard of review. "It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 505, 746 A.2d 1277 (2000). [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Tanpiengco* v. *Tasto*, 72 Conn. App. 817, 819, 806 A.2d 1080 (2002).

To establish a CUTPA violation, a "claimant's evidence must establish that the conduct at issue falls within one of three criteria. A court must decide whether the conduct (1) offends public policy, (2) is immoral, unethical, oppressive or unscrupulous or (3) causes substantial injury to consumers, competitors or other businessmen." *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 356, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002). Here, the court's conclusion that no CUTPA violation had been established was based on its findings that this dispute essentially was between two private parties and that it concerned their jointly owned business, and, therefore, did not affect the public at large.

The court noted further its sense that the actions of which the plaintiffs complained, although possibly unfair, were not unscrupulous or oppressive. The court's reasoning thus focused on the second and third prongs of the quoted test, although a finding that the first prong is unsatisfied may be inferred.

Our Supreme Court has stated that "purely intracorporate conflicts do not constitute CUTPA violations . . . ." *Ostrowski* v. *Avery*, 243 Conn. 355, 379, 703 A.2d 117 (1997). It has distinguished, however, such internal corporate actions that also have the effect of " 'usurp[ing] the business and clientele of one corporation in favor of another . . . .' " Id., quoting *Fink* v. *Golenbock*, 238 Conn. 183, 212, 680 A.2d 1243 (1996). For example, in *Fink*, where one owner of a private corporation denied the other owner the right to participate in the medical practice that was the business of the corporation, and thereafter formed a new corporation and practice using the assets of, and soliciting the clientele from, the first corporation, a finding of a CUTPA violation was upheld. *Fink* v. *Golenbock*, supra, 186–88, 212–15. Similarly, in *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 485, 656 A.2d 1009 (1995), a corporate president accepted employment with a competing firm, falsely told clients of the corporation that it was being taken over by the competitor and that they should take their business to the competitor and solicited employees of the corporation to seek employment with the competitor. The president's actions were found to be unfair trade practices and, thus, violations of CUTPA. Id., 494.

Contrary to the plaintiffs' argument in their brief, the present matter involves purely intracorporate matters and, hence, is dissimilar to cases such as *Fink* and *Chelsea Realty Co.* Specifically, although Howard Sr. wrongfully retained the proceeds from the decedent's life insurance policy, he did not use them in a manner

that placed him in direct competition with Russell Linen by usurping its customers, employees or assets. Rather, by applying the insurance funds to the loans and expenses of Russell Linen, he acted in a way that actually benefited the company, albeit at the plaintiffs' expense. The dispute here concerns only ownership interests and proper distribution of the insurance money, not the business operations of Russell Linen. Moreover, the dispute is between Russell Linen, majority shareholder Howard Sr. and the plaintiffs, who are reluctant minority shareholders by virtue of inheritance, over Howard Sr.'s failure to abide by the buy-sell agreement, and does not affect outside interests. Cf. *Chester* v. *Schatz & Schatz, Ribicoff & Kotkin,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 447376 (June 3, 1991) (7 C.S.C.R. 721) (internal strife of partnership held outside scope of CUTPA). Accordingly, the court's assessment of the dispute as intracorporate and outside the purview of CUTPA is not clearly erroneous.

Additionally, we cannot say that the court improperly found that Howard Sr.'s actions, while unfair, were not unscrupulous, oppressive or violative of public policy. Although the conduct at issue is not commendable, it nevertheless was not entirely self-interested or wholly egregious. As previously explained, there is no indication from the evidence that Howard Sr. used the insurance proceeds for personal or family matters. Further, when he applied the funds to reduce the liabilities of Russell Linen, the plaintiffs, as shareholders of that company, benefited somewhat from its improved financial condition in the same manner as did Howard Sr. On the basis of the foregoing, we conclude that the court properly found that the acts complained of did not constitute unfair trade practices in violation of CUTPA.

To summarize, the court correctly determined in the accounting action that all of the auditor's fees incurred

were chargeable to Howard Sr. As to the contract action, contrary to the defendants' characterization of the judgment, the court correctly rendered judgment only against Howard Sr. as to the count alleging breach of an express buy-sell agreement. Because it has been inadequately briefed, we decline to address the defendants' claim of error pertaining to the court's finding of an implied agreement between Howard Sr., Russell Linen and the decedent. We need not address the claim as to the third count of the complaint because our affirmance of the court's judgment as to counts one and two provides independent bases of liability for Howard Sr. and Russell Linen. We agree that the court improperly found in favor of the plaintiffs on the theory of unjust enrichment because, as to Howard Sr. and Russell Linen, it already had found them liable on breach of contract theories and, as to Howard Jr. and Helen Russell, there was no evidence that they had benefited from the improprieties alleged. The defendants' claim that there was no consideration for a binding buy-sell agreement is without merit. In fixing the amount of damages, the court improperly relied on the valuation of Russell Linen provided by the plaintiffs' expert to the extent that that valuation included as an asset the proceeds of the decedent's $500,000 life insurance policy. Finally, the court properly concluded that the conduct complained of did not constitute an unfair trade practice as contemplated by CUTPA.

The judgment in the accounting action is affirmed. The judgment in the contract action is reversed as to count four and the case is remanded for a redetermination of damages in that action in accordance with this opinion. The judgment in the contract action is affirmed in all other respects.

In this opinion the other judges concurred.